IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

|  |  |  |
|---|---|---|
| | * | |
| JUANDA CALLIER, | | |
| SARAH CARTER, | * | CIVIL ACTION FILE NO. |
| NATRIOUS JACKSON, | | |
| DARREN WHITFIELD, | * | |
| | | |
| **Plaintiffs** | * | |
| | | JURY TRIAL DEMANDED |
| v. | * | |
| | | |
| **CEDAR TREE FAMILY AND** | * | |
| CHILDREN SERVICES, LLC, and | | |
| MICHAEL MILFORD, individually | * | |
| | | |
| **Defendants** | | |

## <u>COMPLAINT</u>

Come now Juanda Callier, Sarah Carter, Natrious Jackson and Darren

Whitfield (hereafter by nominal Plaintiff or collectively referred to as Plaintiffs)

and file this action against Cedar Tree Family and Children Services, LLC (Cedar

Tree) and Michael Milford (Milford) and show as follows:

CAUSES OF ACTION

1.

This is an action for overtime compensation and other relief brought

pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq.,

retaliation under the Federal False Claims Act, 31 U.S.C. § 3730(h), retaliation as

proscribed by the Georgia Taxpayer Protection False Claims Act, O.C.G.A. § 23-3-1229L)(1) and violation of 42 U.S.C. § 1981 for racially discriminatory compensation practices.  Plaintiffs also seek recovery under theories of Breach of Contract and Fraud in the Inducement under Georgia Law.  Plaintiffs seek attorney's fees and expenses for bringing this action as provided by law.

JURISDICTION AND VENUE

2.

Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1391(b).

3.

This court maintains supplemental jurisdiction over Plaintiffs' state law breach of contract claims pursuant to its power to exercise pendant jurisdiction.

4.

The acts and omissions by Defendants arose out of Defendants' efforts in Muscogee County, Middle District, Georgia and therefore venue lies with this Court pursuant to 28 U.S.C. §1391(b) as the acts giving rise to the claims alleged herein occurred within this district.

PARTIES

5.

Plaintiff Juanda Callier is a Female African-American resident of Geneva, Talbot County, Middle District, Georgia and was employed by Defendants in Muscogee County to provide social services for Defendants, who were contracted to act as surrogates in certain matters for the Department of Family and Children's Services (DFCS) in multiple counties of the State of Georgia, to include Muscogee. During the majority of her employment, Callier held the position of Family Services Counselor.  Her employment with Defendant Cedar Tree ended shortly after certain complaints were made regarding the failure of Defendants to pay lawfully owed compensation.  Plaintiff Callier submits herself to the jurisdiction of this Court.

6.

Plaintiff Natrious Jackson is a Female African-American resident of Manchester, Meriwether County, Middle District, Georgia and was employed by Defendants in Muscogee County to provide social services for Defendants, who were contracted to act as surrogates in certain matters for the Department of Family and Children's Services (DFCS) in multiple counties of the State of Georgia, to include Muscogee.  During the majority of her employment, Jackson held the position of Family Services Counselor.  Jackson's employment with

Defendant Cedar Tree ended shortly after certain complaints were made regarding the failure of Defendants to pay lawfully owed compensation. Plaintiff Jackson submits herself to the jurisdiction of this Court.

7.

Plaintiff Darren Whitfield is an African-American Male resident of Newnan, Coweta County, Northern District, Georgia and was employed by Defendants in Muscogee County to provide social services for Defendants, who were contracted to act as surrogates in certain matters for the Department of Family and Children's Services (DFCS) in multiple counties of the State of Georgia, to include Muscogee. During the majority of his employment, Whitfield held the position of Family Services Counselor. His employment with Defendant Cedar Tree ended shortly after certain complaints were made regarding the failure of Defendants to pay lawfully owed compensation. Plaintiff Whitfield submits himself to the jurisdiction of this Court.

8.

Plaintiff Sarah Carter is a Female African-American resident of the Middle District of Georgia and was employed by Defendants in Muscogee County to provide social services for Defendants, who were contracted to act as surrogates in certain matters for the Department of Family and Children's Services (DFCS) in multiple counties of the State of Georgia, to include Muscogee. During the

majority of her employment, Carter held the position of Emergency Placement

Operative, beginning November 2014, and working 12 to 24 hours per day at the

Days Inn and Howard Johnson in Columbus, Georgia.  She was to receive $17.50

per child per hour.  Defendants altered her pay and she terminated the relationship

September 7, 2015.  Defendants paid her $3,042.10 less than the required

agreement.  Plaintiff Carter submits herself to the jurisdiction of this Court.

9.

Defendant Cedar Tree Child and Family Services, LLC is a Georgia Limited

Liability Company with its principal office at 3604 St. Marys Road, Columbus,

Muscogee County, Middle District, GA, 31907, where it may be served through its

registered agent, Defendant Michael Lawrence Milford.  It is herein alleged that

Cedar Tree is the alter ego of Defendant Michael Milford, and that the assets of the

two, Cedar Tree and Milford, have been so intermingled as to forfeit any protection

otherwise afforded by the corporate veil such that a finding of liability against

either Defendant should be a determination of liability against both Defendants.

Therefore, when used hereunder, the term 'Defendant' alone, without other

qualification, shall refer to both, or either, as the context allows.

10.

Defendant Michael Milford is a resident of Muscogee County, Middle

District, Georgia and is CEO of Cedar Tree Family and Children's, LLC.  He is

alleged to be the alter ego of Defendant Cedar Tree, and he directly made adverse employment decisions affecting Plaintiffs' work and compensation.  He may be served personally at 635 Georgia Drive, Columbus, GA 31907.  It is herein alleged that Milford has commingled personal and corporate assets to such a degree that the line of demarcation as between him and Cedar Tree has ceased to be valid for purposes of piercing the corporate veil and joint and several liabilities.  Since the assets of the two, have been so intermingled, any protection otherwise afforded this individual Defendant by the corporate veil doctrine is forfeited.  As such, a finding of liability against either Defendant should be a determination of liability against both Defendants.  Therefore, when used herein, the term 'Defendant' alone, without other qualification, shall refer to both, or either, as the context allows.

## STATEMENT OF FACTS

## COMMON FUNDAMENTAL MATERIAL ALLEGATIONS

### 11.

Plaintiffs were each employed by Defendants as Family Services Counselors.

### 12.

Defendant Milford, by and on behalf of Cedar Tree, hired Plaintiffs into the position, which, at the time of hire was alleged to be a part time contract position,

and they were as such for purposes of taxes, regular wages, and overtime compensation.

13.

After beginning their employment with Defendants, Plaintiffs quickly discovered that the positions were not independent part time.  Further, Milford exercised complete control over the time, method and manner of Plaintiffs' employment from the time of hire until their termination, such as to render Plaintiffs 'employees' of Cedar Tree, and not 'independent contractors', but employees.

14.

Defendants knew, or should have known, that Plaintiffs were misclassified as independent contractors when, in fact, they were Defendants' employees.  As such, the continuing misclassification of Plaintiffs, and others similarly situated, was in contravention of the Fair Labor Standards Act.

15.

Plaintiffs did not have the opportunity to make profit, bonus or lose money with Defendants' business.  They had no economic risk other than improper payment of wages to them.

16.

Plaintiffs had no investment in Defendants' business upon which they could expect a return.

17.

Plaintiffs had no meaningful opportunity to work (contract) for other employers because Defendants commanded their availability.

18.

Plaintiffs did not offer their services to the general public.

19.

Defendants retained the right to tell Plaintiffs when, where and how to work.

20.

Plaintiffs' labor was an integral and necessary part of Defendants' business.

21.

Defendants provided Plaintiffs with operational training.

22.

Plaintiffs could not delegate the duties Defendants required of them and were required to perform the duties personally.

23.

Plaintiffs were unable to employ assistants.

24.

Defendants maintained a continuing and continuous working relationship with Plaintiffs.

25.

Defendants controlled Plaintiffs' work hours and set schedules.

26.

Defendants controlled the performance of Plaintiffs' work.

27.

Defendants controlled Plaintiffs' rate of pay and method of payment.

28.

Plaintiffs worked full-time for Defendants.

29.

Defendants controlled the locations of Plaintiffs' work.

30.

Defendants demanded specific kinds of reports with specific frequency.

31.

Defendants did not pay Plaintiffs' travel cost, though legally and contractually obligated to pay mileage reimbursement.

32.

Defendants provided materials used in Plaintiffs' work.

33.

Defendants had the right to fire Plaintiffs anytime they desired for any reason they desired.

34.

Plaintiffs had no right to hire or fire any persons.

35.

Plaintiffs could quit their jobs whenever they wanted without concern for contractual penalty.

36.

None of the foregoing is characteristic of the definition of independent contractor, but all those properties obtained with respect to each Plaintiff.

37.

Plaintiffs were damaged by Defendants' misclassifying them as independent contractors, when in fact they were employees because Defendants failed to properly withhold tax payments as well as failed to provide proper employer contributions for Social Security withholdings. Similarly, Defendants failed to provide the correct regular and overtime pay to which Plaintiffs were entitled had they been properly classified as employees.

38.

Defendants purported to have Plaintiffs sign a document stating that they were independent contractors and further delineating their compensation and benefits; however, to date, the only alleged contract Defendants have produced to validate this assertion has been a document which contains the forged signature of one of the Plaintiffs, as set out more fully herein below.

39.

Defendants' misclassification of Plaintiffs as independent contractors, as opposed to employees, is intentional behavior that knowingly seeks to maximize Plaintiffs' liability with regard to taxes and minimize any employment related benefits to which Plaintiffs would otherwise be entitled.

40.

Defendants have submitted, and upon information and belief continue to submit, requests for authorization, approval, and payment of funds under a contract or contracts by and between Defendants and the State of Georgia and/or one or more of its political subdivisions, for services allegedly rendered by Defendants or on their behalf by Plaintiffs.

41.

Plaintiffs aver herein that with respect to those requests for authorization, approval and payment, several conditions maintain:  Defendants are over-billing

for services that were either not provided or were provided by someone or something not qualified to provide those services, *i.e.* a non-degreed, non-certified individual is being treated as a degreed certified individual for purposes of invoicing the State, and/or Invoices are being submitted by Defendants for services performed by degreed and certified individuals (*i.e.* Plaintiffs) but the funds so invoiced and requested as reimbursement or compensation for the same are being diverted and not paid over to the individuals contemplated a being the lawful recipient of the same.

42.

Defendants are converting property of Plaintiffs and the State of Georgia for their own use, and in the process they are unlawfully diverting funds and assets paid from the Treasury of the State of Georgia and the United States from the lawful use approved, authorized and ascribed for the same.

JUANDA CALLIER

43.

Plaintiff Callier began working with Cedar Tree Family and Children Services, LLC on February 15, 2015.  That day she was assigned Emergency Placement for 12 hours at the Days Inn in Columbus, Ga.  She had a total mileage of 70 miles at .50 cents per mile.

44.

At the time of her hire, Callier informed Defendant Milford that she lived 35 miles away from Columbus, Georgia.  In contravention of her employment agreement with Defendant Cedar Tree, when compensation was given she received payment for the 12 hours of work only and nothing for her mileage.

45.

In April 2015, Plaintiff Callier worked Emergency Placement for 134.45 hours, and incurred a total of 230 miles for which she was not paid according to her employment agreement.

46.

In May 2015, Callier worked a total of 87.20 hours Emergency Placement; again however, she did not receive mileage reimbursement for the 230 miles of travel that she incurred in the service of Cedar Tree.

47.

In June 2015, Callier worked 48.0 hours, Emergency Placement, and accrued 150 miles in travel.  She did not get paid for the mileage; similarly, that month she did not receive payment for 4 hours which was required for completing 3 Home Evaluations nor the travel associated with completing those evaluations.

48.

In July 2015, Callier worked 54.30 hours for which she was compensated; however, that compensation did not include 6 hours that she worked in completing 4 Home Evaluations.  She also failed to receive travel reimbursement for traveling 548 miles.

49.

In August 2015, Callier was compensated for working 31.15 hours; however, she did not receive compensation for 3 hours of Home Evaluation time or travel reimbursement from and back to her home in Cusseta, totaling 846 miles.

50.

In September 2015, Callier worked a total of 22 hours; she was compensated for this time, but was not compensated for 3 hours required to complete a Home Evaluation.  Again, Callier was not reimbursed for 771 miles in travel.

51.

More than once, Defendant Milford stated, and Callier's employment agreement with Cedar Tree provided, that staff would be reimbursed for travel that started from the employees' home to the assignment destination and back to their home.  The amount of travel reimbursement was to be .50 cents per mile.

52.

In July 2015, Milford unilaterally indicated that he would only pay .32 cents for mileage reimbursement.  Later when staff asked about their mileage reimbursement, Milford became very hostile; he retorted that the checks were not in; he also informed the staff that he was not obligated to pay mileage despite the employment agreements with Cedar Tree.

53.

Callier became concerned when Defendant Milford became agitated when questioned about failing to pay staff mileage for which he received state funds. Although she had not yet received her reimbursement, her expectation of receiving it was an expectation that kept her working with Cedar Tree.

54.

Neither Callier, nor, to her personal knowledge, any of the other staff would willingly travel so many miles in their personal vehicles knowing they were not going to get paid for putting wear and tear on a personal vehicle or get paid their normal $17.50 per hour for the travel time.

55.

Based on her concerns, Plaintiff Callier demanded of Milford her unpaid travel money as well as the compensation for the hours spent completing the Home Evaluations for which she was still owed.

56.

Milford refused to pay Callier the money that she was owed under her employment agreement with Cedar Tree.

57.

Milford then informed Callier that when Plaintiffs were hired all staff signed a contract that expressly stated mileage would not be paid.

58.

Callier told him that she did not sign a contract stating she would not be paid travel, and even if she did, he specifically stated after hiring her that she would be paid travel.

59.

Milford always insisted that Plaintiffs submit timely mileage reports.

60.

That was because Milford's contract with the State to provide services also provided for mileage reimbursement.

61.

Milford was submitting staff travel reports to the State for reimbursement, but he was not forwarding reimbursement to Callier or other staff members upon being paid for the same by the State.

62.

This information is confirmed by documents obtained from Cedar Tree by another Plaintiff to this action.

63.

Callier's information and belief was based upon having been employed with Georgia Department of Family and Children's Services (DFCS) for 23 years, during which time she processed Service Authorizations for service providers such as Cedar Tree.  Those Service Authorizations included requests for, and approval of, payment for services to include travel.  Once authorized, the Service Provider received one check that included all authorized reimbursements which was sent from the Regional Account.

64.

Callier informed Defendant Milford that he was stealing from her, the State of Georgia and the other employees by not paying according to Cedar Tree's employment contract and in contravention to the terms of Cedar Tree's contract with the State to provide those services.

65.

Callier also indicated that as a result of Milford converting funds that were owed to her and others, she, as well as other members of the staff, were unable to

meet their personal budgets: It was causing financial difficulties for all the employees.

66.

Callier further indicated that if Milford did not pay her according to the law and their agreement, she would take action regarding Cedar Tree and Milford's financial misconduct and she would make further inquiry into the legitimacy of his policy regarding employee mileage compensation.

67.

When Callier confronted Milford about his possible conversion of funds, approved and allocated for staff mileage reimbursement, Defendants refused to reimburse her for the mileage she accrued, terminated her and she has not been reimbursed for her previously unpaid hours worked.

68.

Overall, Callier worked with Milford in the employ of Cedar Tree for six (6) months.  During that time, she put wear and tear on her personal vehicle, was forced to use, and incur charges, on her personal cell phone and she expended much time and energy in performing her duties, which made a profit for Cedar Tree, and by extension, Milford, for which she was not compensated or was under compensated.

69.

The behaviors of Defendants have caused Callier unnecessary stress, frustration, worry and mental anguish. She was beset with anger issues related to her perceptions of having been robbed of money that she worked for due to Defendants failing to reimburse her according to her agreement with them and/or in compliance with Cedar Tree's contract with the State of Georgia.

70.

Callier asserts that Milford's active fraud in misrepresenting the terms of her compensation as staff with Cedar Tree, as well as the amounts of the same, she would not have been induced to take the position. If she had not taken the position, she would not be in the position in which she found herself after her employment with Cedar Tree terminated.

71.

The failure of Defendants to provide complete and timely compensation has resulted in Callier's being damaged and has given rise to False Claims against the State of Georgia.

72.

Defendants paid and/or caused to be paid funds to white employees which African American employees were not paid, for similar work performed by both

races as employees of Cedar Tree.  The only reason for the difference in payment would be race, as the work was the same.

NATRIOUS JACKSON

73.

Plaintiff Jackson began working with Defendants in July of 2014.  Jackson was one of the first persons Milford hired as an alleged 'contract' worker for Cedar Tree.  She was terminated after multiple African Americans, to include her, complained to Defendants about Defendants failing to pay their earned mileage reimbursement as well as the disparate treatment of the African American staff compared to the Caucasian staff with regard to mileage reimbursement and the amounts thereof.

74.

Milford signed an 'MOU' -Memorandum of Understanding - with Georgia DFCS, and his services were employed through Cedar Tree to serve the population normally serviced by DFCS.

75.

Previously, Jackson worked for the Department of Family and Children Services for in excess of seventeen (17) years, and was well acquainted with DFCS operations and of its interactions with contract Service Providers.

76.

Jackson advised Milford of various ways Cedar Tree could increase its business as well as provided some contacts within the agency.  Jackson also advised Milford regarding appropriate presentation of the business to DFCS and others; Jackson was also able to provide input into the most effective items to successfully solicit DFCS business.  Jackson also assisted Milford with developing questions for the assessments Cedar Tree administered to the clients referred from DFCS.

77.

Jackson was induced to engage in an employment relationship with Cedar Tree when Milford promised a position within the company that would mature into a management/director position in Georgia upon expansion.  In hindsight, Milford did not intend to offer any such position to Jackson; rather, Milford made such promises in order to exploit Jackson's labor.  But for the promised position, Jackson would not have engaged with Cedar Tree and Milford.

78.

During the first month of business, Milford, for Cedar Tree, received a contract from Clayton County DFCS.  Jackson, along with a couple of other workers, traveled from their homes to complete backlogged assessments for

Clayton County.  At the time, Milford verbally committed to pay Jackson $135 per assessment and up to $75 in mileage for each case.

79.

Milford stated that Cedar Tree would compensate Jackson from Jackson's home to the residence of the family being assessed and back to Jackson's residence on a per case basis at .50 per mile.  Based upon, *inter alia*, those promises, Jackson completed ten (10) cases, yet received only $135 for completed assessments, and that was received about two months later.

80.

When Jackson inquired concerning mileage reimbursement Cedar Tree was to pay for the travel on the cases, Milford told her that mileage would be reimbursed as soon as he received the check for the same from the contracting agency.  To date, Jackson has received no reimbursement for the mileage accrued.[1]

81.

In November 2014, Jackson was assigned ten (10) more of Clayton County, Georgia cases with the same agreement in place: Jackson was to receive $135 for completed assignments and $70 for unsuccessful attempts, in addition to a mileage reimbursement of 0.50 per mile.

---

[1] It should also be noted that Milford's statement to Jackson about reimbursing the mileage when he received the same in Cedar Tree's name corroborates Callier's assertions that Milford and Cedar Tree were submitting the mileage logs of the Cedar Tree staff for reimbursement to the responsible state agency.

82.

To date, Plaintiff Jackson has not received compensation for the mileage accrued.  When inquiry was made, Milford continuously stated that he had not yet been reimbursement from Clayton County DFCS for the mileage expenses.

83.

On information and belief, the above was an untrue statement as other invoices for payment for services had been paid, and it was Jackson's experience, from working with a Georgia DFCS office previously, that such authorizations for payment included both the time billed as well as mileage in a single invoice.

84.

In December 2014, Jackson was assigned 10 more cases from Clayton County DFCS with the same agreement in place: Jackson would receive $135 for completed assignments and $70 for unsuccessful attempts plus mileage at .50 per mile.  To date, Jackson has not received compensation for this mileage. Furthermore, Jackson was not paid for all of the assessments conducted during this period.

85.

When the failure to provide compensation was brought to Milford's attention, he would become very hostile and agitated.  This would include Milford either cursing at Jackson or hanging up the phone.

86.

On December 28, 2014, Jackson tore ligaments in her right knee and was incapacitated for several months.  Jackson required surgery and developed a bacterial infection in her knee.  During this period, Milford had not paid for Jackson's November services.  He visited Jackson's home and rudely, loudly and opprobriously addressed Jackson about un-submitted notes.  He repeatedly called Jackson with accusations that she was adversely affecting his business and his billing.

87.

Finally, following a disrespectful barrage of hostility, Jackson informed Milford that she was bedridden and otherwise incapacitated with pain such that she was unable to type or complete any assignments; Jackson also informed Milford that the leg with torn ligaments was immobilized.  After Jackson received several hostile and aggravating calls, a co-worker, Darrien Whitfield, agreed to type the notes and send them to Milford.

88.

Jackson was unable to return to work with Cedar Tree until April, 2015. Milford had not paid Jackson for any of the November or December, 2014 services.  At the end of April, 2015, Milford finally paid Jackson most of the

arrearages with the exception of any of her travel. Milford only paid the arrearage after Jackson begged for her earnings.

89.

Milford exhibited explosive behavior. Generally, near the 15th of each month he became very irate. Milford never paid Jackson on the 15th until June of 2015. Prior to that, Jackson always received what compensation Milford did pay on or after the 21st of each month. Further, Milford visited Northside Recreation Center and demonstrated loud hostilities in the presence of foster children that Jackson was supervising, when he paid Jackson for the November and December 2014 services. Jackson was on crutches at the time, and still on crutches when returning to work.

90.

Milford's behavior was so outrageous that the foster children, who were both present and upset at the behavior, intervened. The children told him that he was not going to keep disrespecting Jackson. They told him that he needed to pay what he owed. In response, he snarled that he had not been paid mileage for any of the services completed since August 2014.

91.

Implicitly, Milford's statement about not receiving mileage reimbursement from the contracting Agencies since August 2014 means that mileage

reimbursements prior to that time had been received.  However, Jackson was not reimbursed for the mileage she accrued during the pre-August 2014-time period.

92.

During the month of April 2015, Jackson and other staff of Cedar Tree were supervising children for whom DFCS could not find placement.  Jackson would work sometimes as much as seventeen (17) hours continuously with no lunch break.

93.

Jackson would transport those poor children from the DFCS office to Northside Recreation Center to a Burger King and the library on Macon Road, as well as pick children up from school; this would be accomplished through the use of her personal vehicle, yet Milford would not reimburse Jackson for mileage.  To date there has still been no reimbursement for the mileage.

94.

In May 2015, Milford asked Jackson to complete a number of transportation and supervised visits for Cedar Tree.  Milford expressly confirmed that Jackson would be paid .50 per mile, plus the hourly wage.  Milford stated that mileage would begin from Jackson's home and end upon her return home.

95.

Based upon those inducements, Jackson made trips from Manchester, Georgia to Dublin, Georgia, from Manchester to Douglasville, Georgia to Zebulon, Georgia back to Douglasville and then to back to Manchester.  Jackson also made several trips to Columbus, Georgia from Manchester to pick up children, and then traveled to Molena, Georgia to pick up another child who had to be taken to Conyers, Georgia.

96.

In all, during this period, Jackson placed over 1,000 miles in business related travel on her personal vehicle, paying for the gas and subjecting her vehicle to a significant amount of wear and tear.  Defendants did not provide reimbursement for this mileage.  Once again, Milford informed Jackson that the mileage reimbursement would be paid as soon as the mileage money had been received in his office from the contracting agency.  To date, Jackson has not been paid for her services as promised.

97.

In June 2015, Jackson transported children back and forth to their placements, as in previous months; Defendants have not provided compensation or mileage reimbursement for those services.

98.

At the end of June 2015, Milford called a meeting of Cedar Tree staff at which he required everyone to sign a contract stating that mileage would be reimbursed, but only at .32 per mile.

99.

Plaintiff Jackson had personal knowledge that Defendants were getting .57 per mile, and prior to the June meeting, he was promising (at least to Jackson) to pay .50 per mile for travel reimbursement.

100.

Following the June meeting and being apprised of Jackson's knowledge of State payments, Milford pulled Jackson aside and informed her that he would still pay Jackson .50 per mile because of the long trips she was required to make.

101.

Howard, another transporter, walked out of the June 2015 meeting because he was agitated and irate about the reduced amount Milford was trying to get the staff to accept for mileage.  Milford contacted Howard the next day and recanted on the .32 per mile reimbursement term.  Milford agreed to pay Howard .50 per mile.

102.

Howard is a Caucasian.  The Plaintiffs are African American.  The difference does not stop there: Defendants were paying Howard his mileage.  On information and belief, all the white staff members who accumulated mileage for reimbursement were actually being paid for most, if not all, of their mileage.

103.

Few, if any, of the African American staff members were being paid their accrued mileage reimbursement.

104.

To the extent that African Americans were being reimbursed somewhat for their mileage, it did not approximate the amounts and consistency of that being received by Caucasians.

105.

That behavior by Defendants was clearly overt race discrimination, whether the instant cause of action is otherwise more properly proven a mere breach of contract or whether or not the more inclusive FLSA, FCA retaliation, and Fraud asserted herein are found to be sustainable.

106.

During the month of June, Plaintiff Jackson traveled to Bowdon from Manchester, to Reynolds, to Thomaston and back to Reynolds, supervised a 2-hour

visit between two sisters, and transported a child to Union City as well as drove back to Manchester in a single day. Plaintiff Jackson has still not received reimbursement for that travel, either at the proffered lower rate or the rate promised, agreed upon and subsequently reaffirmed.

107.

In late June 2015, Milford told the staff that some travel reimbursement had been received, and he would determine to whom the money was owed and remit payment by July1, 2015. To date, neither Milford nor anyone else with Cedar Tree have done so; however, Jackson was told that the [**redacted**] (a Jackson case assignment) mileage was received, and that he would pay Jackson before he left on a trip to Texas in July, 2015.

108.

Milford did not pay as promised; as such, and to the extent that the money for the [**redacted**] case was received in the Cedar Tree office, Milford converted those funds for his own use rather than paying them over to Jackson, in contravention of the law and the contracts obtaining instanter.

109.

In July 2015, Plaintiff Jackson used her personal vehicle to transport children in a manner consistent with reimbursement under the contract between

Jackson and Cedar Tree as well as between Cedar Tree and the Contracting Agency.  Jackson still did not receive payment for her services.

110.

Further, each time Milford was asked about travel reimbursement payments by African American staff members, and specifically Plaintiff Jackson, the enquirers were scolded, hung up on, and denied the money owed.

111.

During this period, while Plaintiffs were going unpaid and unreimbursed for their mileage, Milford boasted loudly of making over $500,000 in the previous year for himself.

112.

In August 2015, Jackson traveled on Cedar Tree business and did not receive reimbursement for that travel.  When asked by Jackson and other African Americans, Milford repeated the mantra, stating that the mileage check had not been received from any of the DFCS offices dating back to August, 2014.

113.

Plaintiff Jackson knew Milford's statements about not receiving any payments from DFCS to be untrue; during the course of the instant litigation, records from DFCS Regional Accounting for and from Meriwether, Upson, Clayton, Fayette, Muscogee and Harris Counties will be discovered which will

confirm Jackson's personal knowledge and give proof that Milford was less than honest in his communications to Plaintiffs regarding mileage reimbursements.

114.

There were home evaluations that Jackson completed where it is certain that Milford collected mileage. There were also counseling cases in Meriwether, Upson and Harris, Counties that Jackson completed and did not receive mileage reimbursement, but Defendants did.

115.

To Jackson, Milford proved to be very rude, unprofessional and dishonest. Milford would often call, yell and curse at Jackson on the phone. Jackson would sometimes text him back, and occasionally curse Milford because the abuse Milford was handing out to Jackson and the other Plaintiffs was getting tiring and weary. Jackson would text Milford on those occasions rather than call him because she did not want the children to hear such unprofessional lashing out.

116.

Milford, however, displayed no apparent shame to anyone, including clients, for his cursing and berating people on the phone. Jackson would often have to walk out of the hotel room, where she was conducting sessions, out of respect for the children, because Milford would call and start yelling indiscriminately.

117.

In fact, Milford would also yell at and verbally abuse the children under Cedar Tree's charge as well.  He would also get in their personal space and threaten them. The children would respond by telling him that he was disrespectful.  The children would beg the staff, Jackson in particular, not to let Milford talk to them in such a way.

118.

Plaintiff Jackson recalls one incident, where Milford visited the hotel where she was supervising two young ladies, and scolded her for failing to record her mileage on a mileage form.  Milford had not provided Jackson with a new form because she had not worked since December, 2014; it was shortly after Jackson had returned to work from her injury.

119.

Milford allowed his sister and mother to begin working for Cedar Tree.  His mother had no experience in the human services profession; she had no degree, she was a cosmetologist by trade.  His sister had a Bachelor's degree, but she also had another job.

120.

Once his mother and sister began to work, Milford would not utilize most of the staff who had been working with Cedar Tree (mostly the African Americans) and who were more qualified to do the work.

121.

On information and belief, the fact that Milford's mother did not have a degree or was even nominally qualified, Defendants billed Milford's mother's services to the State as if she had both a degree and qualifications for the work.

122.

When asked, Milford stated that his mother and sister would be angry with him if he did not utilize them instead of the current staff who were being edged out.

123.

Milford and his mother would have arguments, and she walked out on him several of times because of the manner in which he spoke to her; the arguments would entail accusations that Milford was not compensating her correctly, also.

124.

Over the course of Jackson's employment, Milford frequently proved to be disingenuous; he was exhibiting unprofessional, dishonest, selfish and rude

behavior toward Jackson who is destitute because Defendants owe her thousands of dollars.

125.

Milford refused to pay Jackson and her co-workers money that was rightfully owed, while he and his sister purchased brand new BMW automobiles.

126.

Milford sent Jackson an email after two of Jackson's co-workers asked him to pay them.  Jackson had nothing to do with their conversation.  However, it seems that since Jackson referred them to him, he sent all of them an email stating that they were not to enter upon his property, and that Plaintiffs should go their separate ways from Defendants.

127.

Plaintiff Jackson conversed with Milford via text message after Milford had sent a separation text.  It was during those texts, that Jackson mentioned contacting a lawyer to recoup the money that she was owed.

128.

In response to Jackson's warning of pursuing legal action, Milford sent Jackson a bogus contract that Jackson had not signed.  Milford either forged Jackson's name or scanned it from another document.

129.

Along with the forged contract, Milford had her to take it (the contract Milford forged) to the lawyer.

130.

On its face, the contract Milford forged Jackson's name to, was unprofessionally prepared.  It did not exhibit a date, and he had inserted paragraphs and sentences that were not part of the original contract.

131.

For example, Milford stated in one paragraph that he did not pay mileage. That language was never in a contract Jackson signed with her hand.  Milford inserted it into the forged document, in further support his theft and conversion of Jackson's duly owed fiscal remuneration for work done, billed, authorized and paid for by the State.

132.

It is not reasonable to presume that anyone would travel all over Georgia placing wear and tear on a personal vehicle without compensation by the company requiring and benefiting the travel.

133.

Similarly, if mileage does not matter and is not being reimbursed, it would be unreasonable for staff to turn in mileage on invoices.

134.

Further, if Cedar Tree were not being reimbursed for the mileage it makes no sense that Milford would harangue the employees about completing mileage reports.

135.

Milford paid Jackson $447 in August 2015, for mileage on 3-4 of the cases she previously worked.  That was a *deminimis* amount considering the volume of unpaid, UN-reimbursed mileage from Jackson's many cases which involved extensive travel.

136.

The payment of any money belies the contentions that Defendants did not pay mileage reimbursement as a matter of practice or policy.

137.

Plaintiff Jackson possesses text messages in which she and Milford discussed the mileage issue, and the same will be made available in discovery.

138.

Also, in the forged contract, Milford, the drafter, stated that either party could terminate the contract, but that it would require a written letter within 7 days of occurrence. To date, Plaintiff Jackson has not received such a letter; however, Milford surely terminated her contract when she began to complain about his

conversion of employee money and mileage reimbursements. Therefore, he is in violation of his own forged document.

139.

Plaintiff Jackson is seeking compensation for the money that she would have earned from the day and time she first incurred travel reimbursement for which she was not paid until the present with interest.

140.

Similarly, Defendants engaged in fraud and other actionable unlawful behavior, such that Jackson is entitled to compensation damages.

141.

As a result of Milford's attitudes and prejudices, Jackson and the other Plaintiffs had to work under hostile conditions and deal with overt discrimination for which there is no bona fide excuse under the law.

142.

Milford repeatedly told his staff that the position was part time work; each assignment had a deadline.  Milford would state he wanted the staff to complete the work expeditiously within a week; however, most assignments had 30 day deadlines.

143.

Jackson repeatedly expressed that to do thorough and accurate work, especially where children and their tender psyches were involved, it was not a practice, policy or procedure to rush the work assignments.

144.

Most of the assignments required spending hours interviewing the clients as well as typing up the documentation; this happened while the staff member would have to also be serving in other capacities.

145.

Specific children who witnessed what could be characterized as extreme verbal abuse to which Plaintiff Jackson was exposed include, but are not necessarily limited to [**not published herein for privacy consideration**] - all from Muscogee DFCS.

SARAH CARTER

146.

Plaintiff Carter has set forth her claims for underpayment in Paragraph 8, *supra,* and does not herein restate them.

DARREN WHITFIELD

147.

Plaintiff Whitfield entered into an employment arrangement with Defendants and began work under the same in or about October, 2014.

148.

Whitfield conducted and completed a number of assessments for Cedar Tree to include CCFAs, Home Evaluations, Family Support Assessments, Substance Abuse Assessments, and Parent Fitness Assessments.

149.

Whitfield received compensation for the assessments he conducted, although compensation for the Family Support Assessments were not paid until 4 to 5 months after they were submitted.

150.

Milford also informed Whitfield that he should be certain to submit his mileage report for each case worked, because Cedar Tree would pay up to the maximum of $75 per case, especially for the Family Support cases.

151.

Based on Milford's representations, Whitfield submitted the mileage invoices on his cases and assessments, but Cedar Tree did not reimburse Whitfield for the mileage invoices as submitted.  Whitfield was reimbursed approximately 2

or 3 times for the mileage accrued while in the service of Cedar Tree, and that reimbursement was not for the full amount owed.

152.

There were also two occasions where Whitfield transported a child from Columbus to Americus, Georgia, wherein Milford specifically agreed to compensate Whitfield, but the compensation for that mileage was never forthcoming.

153.

When Whitfield would ask when he would receive compensation for the mileage he had accrued, Milford would promise that it would be forthcoming once the checks came in from the various offices.

154.

Milford further indicated that after he had received said checks, he would need to go through and determine which invoices the checks covered and reimburse Whitfield accordingly.  However, to date, Defendants have not reimbursed Whitfield for all of the mileage he accrued in the service of Cedar Tree.

155.

Under the agreement between Cedar Tree and Whitfield, Whitfield is still owed approximately $1,000 in unpaid mileage compensation as a result of assessments completed and invoiced.

156.

Whitfield obtained a document from Cedar Tree indicating that Cedar Tree does invoice the Contracting Authorities for mileage as accrued by its workers, and that Cedar Tree is compensated for the mileage as submitted at the State rate. (EXHIBIT **A**), ATTACHED TO THIS COMPLAINT AND MADE A PART HERETO.

## THEORIES OF RECOVERY

## COUNT I

## FAIR LABOR STANDARDS ACT (FLSA)
## FAILURE AND REFUSAL TO PAY EARNED WAGES
## FAILURE TO PAY OVERTIME- FAILURE TO WITHHOLD

157.

Plaintiffs restate and incorporate by reference ¶¶ 1- 156 of their complaint as if fully set forth herein.

158.

Plaintiffs are entitled to collect unpaid wages pursuant to 29 U.S.C.S. § 206 (a) and 29 U.S.C.S. § 207 (a).

159.

29 U.S.C.S. § 207 (a) provides, in pertinent part,

(1) … no employer shall employ any of his employees … for a workweek

longer than forty hours unless such employee receives compensation for his

employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

160.

29 U.S.C.S. § 216(b) provides, in pertinent part… "Any employer who violates the provisions of § 6 or § 7 of this Act (29 U.S.C.S. § 206 or § 207) shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."

161.

Defendants failed and refused to pay Plaintiffs their contracted rate of remuneration as employees for their mileage reimbursements as well as for certain hours of regular and overtime worked during the course of their employment, as set out herein above.  Similarly, Defendants failed to make proper legal withholdings such that Plaintiffs have had to pay the same out of their own earnings, in contravention of the law.

162.

Plaintiffs are entitled to recover from Defendants those underpaid wages, reimbursements and withholdings liquidated by a multiplier of 2.

163.

Defendants are jointly and severally liable to Plaintiffs for the amount unpaid as a result of Defendants intentionally misclassifying Plaintiffs to avoid payment of the same.

164.

Plaintiffs are entitled to recover from Defendants that underpaid overtime liquidated by a multiplier of 2.

165.

Damages pursuant to this theory of recovery can and will be calculated with greater accuracy for each Plaintiff claiming hereunder after the completion of discovery and before trial.

166.

All Plaintiffs to this action claim under this theory of recovery.

COUNT II

FALSE CLAIMS ACT – RETALIATION
31 U.S.C. § 3730(h)

167.

Plaintiffs restate and incorporate by reference ¶¶ 1-166 of their Complaint as if fully set forth herein.

168.

Plaintiffs, individually and as a group, are entitled to collect damages from these Defendants for their retaliation against them pursuant to 31 U.S.C. § 3730(h), or The Georgia False Claims Act pursuant to O.C.G.A. § 23-3-121(1) which provides that any person, firm, corporation, or other legal entity that knowingly presents or causes to be presented a false or fraudulent claim for payment or approval shall be liable to the State of Georgia.

169.

O.C.G.A. § 23-3-122 (l)(1) provides that any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of a civil action under this Code section or other efforts to stop one or more violations of this article.

170.

Defendants have retaliated against Plaintiffs Callier and Jackson for raising the spectra of the False Claims Act violation.

171.

Plaintiffs Callier and Jackson are entitled to relief set forth in O.C.G.A. § 23-3-122 (b)(2).

172.

Plaintiffs Callier and Jackson claim entitlement to recovery under this theory.

COUNT III

THE CIVIL RIGHTS ACT OF 1866.
42 U.S.C. § 1981 ("1981")
RACE DISCRIMINATION IN COMPENSATION

173.

Plaintiffs incorporate by reference the allegations contained in paragraphs 1-172 as if fully stated herein.

174.

Defendants' actions as set out above constitute an actionable violation of The Civil Rights Act of 1866, 42 U.S.C. § 1981 ("1981").

175.

As a result of Defendants' actionable conduct, Plaintiffs are entitled to damages - general, compensatory, liquidated, and punitive - in an amount to be proven at trial and awarded according to the enlightened conscience of a jury.

176.

Plaintiffs are also entitled to an award of litigation expenses and attorney's fees according to relevant law.

177.

All Plaintiffs to this action claim entitlement to recovery pursuant to this theory.

COUNT IV

BREACH OF CONTRACT

178.

Plaintiffs incorporate by reference the allegations contained in paragraphs 1-177 as if fully stated herein.

179.

Defendants' actions as set out above constitute an actionable breach of contract with Plaintiffs under Georgia law.

180.

As a result of Defendants' actionable conduct, Plaintiffs are entitled to damages for said breach of contract in an amount to be proven at trial and awarded according to the enlightened conscience of a jury.

181.

All Plaintiffs to this action claim entitlement to recovery under this theory.

COUNT V

FRAUD

182.

Plaintiffs incorporate by reference the allegations contained in paragraphs 1-181 as if fully stated herein.

183.

Defendants' actions as set out above constitute actionable fraud under Georgia law.

184.

As a result of Defendants' actionable conduct, Plaintiffs are entitled to damages for said fraud – to include actual, compensatory and punitive - in an amount to be proven at trial and awarded according to the enlightened conscience of a jury.

185.

All Plaintiffs to this action claim entitlement to recovery under this theory.

COUNT VI

PUNITIVE DAMAGES

186.

Plaintiffs incorporate by reference the allegations contained in paragraphs 1-185 as if fully stated herein.

187.

Defendants' actions constitute willful misconduct, demonstrating wantonness, oppression, and the entire want of care which would raise the presumption or conscious indifference to the consequences that entitle Plaintiffs to recover punitive damages pursuant to the punitive damage provisions of the statutory causes of action hereinabove stated.

188.

All Plaintiffs herein claim under this theory of recovery.

COUNT VII

ATTORNEY'S FEES AND EXPENSES OF LITIGATION

189.

Plaintiffs restate and incorporate by reference ¶¶ 1-188 of their Complaint as if fully set forth herein.

190.

29 U.S.C.S. § 216(b) in particular provides, in pertinent part, …The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

191.

Similarly, the FCA provides for reasonable attorney's fees as does the violations of 42 U.S.C. 1981.

## PRAYERS FOR RELIEF

Wherefore, Plaintiffs respectfully pray as follows;

(a) That summons issue and Defendants be served as by law provided;

(b) That Plaintiffs have and recover of Defendants unpaid wages and withholdings pursuant to the FLSA § 7, 29 U.S.C. § 207, FLSA § 6, 29 U.S.C. § 206(d), liquidated damages as provided by 29 U.S.C. § 216, pre-judgment interest on unpaid wages pursuant to 29 U.S.C. § 216, and court costs, expert witness fees, reasonable attorneys' fees as provided under FLSA § 16, 29 U.S.C. § 216, and all other remedies allowed under the FLSA;

(c) That Plaintiffs Callier and Jackson have and recover of Defendants for Defendants' unlawful Retaliation under the Federal False Claims Act, 31 U.S.C. § 3730 (h) and Georgia Taxpayer Protection False Claims Act, O.C.G.A. § 23-3-122(L)(2), as provided herein;

(d) That Plaintiffs have and recover of Defendants due to injuries as a result of Defendants' violation of 42 U.S.C.A. § 1981, as provided herein;

(e) That Plaintiffs have and recover from Defendants damages for Defendants' breach of contract in an amount to be determined and proven at trial, as provided herein; including but not limited to un-reimbursed mileage expenses.

(f) That Plaintiffs have and recover damages for Defendants' actionable violations of Georgia law, to-wit: Fraud; Defendants' fraud was intentional and designed to cause Plaintiffs unnecessary trouble and expenses.

(g) that Plaintiffs be awarded punitive damages in an amount to be determined by a jury at trial to be sufficient to prevent such conduct as alleged herein from occurring in the future and commensurate with the harm done to Plaintiffs;

(h) That Defendant Cedar Tree be declared to be an alter ego of Defendant Milford such that the corporate veil be pierced and an award against the one be considered an award against the other, and vice versa;

(i) that Plaintiffs be awarded reasonable attorney's fees and expenses of litigation;

(j) That all issues triable by jury be so tried; and,

(k) That Plaintiffs have such further and additional relief as may be just and appropriate.


Submitted this 8th day of September, 2016.

 /s/ John W. Roper
John W. Roper
Georgia Bar No.:  614159

The Roper Law Firm
5353 Veterans Parkway

Suite D
Columbus, Georgia  31904
(706) 596-5353
Fax: (706) 596-5383
johnroper@roperlaw.com